FILED
2024 May-24  AM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT FOR

## THE NORTHERN DISTRICT OF ALABAMA

## NORTHERN DIVIISION

| | | |
|---|---|---|
| WALTER FORD, | ) | |
| | ) | Case No: |
| Plaintiff | ) | |
| v. | ) | Jury Trial Demanded |
| | ) | |
| CITY OF HUNTSVILLE, a municipal | ) | |
| corporation in Alabama; | ) | |
| STEVEN GRAHAM, an individual and. | ) | |
| Employee of the city of Huntsville; | ) | |
| WILLIAM DICKERSON, an individual. | ) | |
| And employee of the City of Huntsville | ) | |

**Defendants**

## COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION

### SUMMARY

1. Plaintiff Walter Ford ("FORD") was subjected to an unlawful search and seizure by members of the North Alabama Drug Task Force ("Officers"). The officers without giving sufficient notice of their office, authority, and purpose, and without being refused admittance by FORD, unilaterally entered FORD's home in violation of his Fourth Amendment right.

2. Upon unlawfully entering FORD's home, the Officers exercised excessive force against FORD and illegally seized property from FORD's home.

3. Within a matter of mere seconds - Officer Steven Graham shot Walter Ford four times despite Ford , posing no  visible threat and not being armed. Ford was seriously injured as a result of being struck by these gunshots in the chest. Ford was immediately taken to the Emergency Room.

4. This incident is captured on officer body camera footage.

5. The Defendant also alleges that the search and seizure was based on a faulty search warrant, unreliable information and the fact a no-knock raid took place when exigent circumstances did not exist.

6.    This incident occurred in part  because the City of Huntsville for many years has failed to discipline officers that have committed egregious violations of use of force and acting outside of the scope of their duties.

## JURY TRIAL

7.    FORD demands a jury trial.

## JURISDICTION AND VENUE

8.    Plaintiff brings this complaint under 42 U.S.C. Section 1983 for damages resulting from the Deprivation of Civil Rights inflicted upon Plaintiff by Defendant. This Court has jurisdiction to this action (28 U.S.C Section 1343, 28 U.S.C. § 1331) and of the parties

9.    Venue is appropriate because Defendant City of Huntsville is a city within the district boundaries for this Court, and because all of the remaining individual defendants, are employed by the City of Huntsville and there is therefore a high probability that all remaining defendants live in or near this Court's district.

## PARTIES

10.   PLAINTIFF  Walter Ford , hereinafter referred to as "Ford", is a resident of Huntsville, Madison County, State of Alabama.

11.   DEFENDANT City of Huntsville is a city incorporated under the laws of the State of Alabama which operates and employs all members of the Huntsville Police Department, the lead organization of the North Alabama Drug Task Force. The City of Huntsville, is an Alabama Municipal Corporation ,that duly organized the Huntsville Police Department (referred to throughout the complaint now as "HPD") and authorized its policies, procedures, customs, and practices which govern the duties and actions of its police officers. The City can be served through its City Clerk at 308 Fountain Circle (City Hall), 3rd Floor, Huntsville, Alabama 35801

12.   DEFENDANT William Dickerson, hereinafter referred to as "Defendant Dickerson" or simply "Dickerson" is a law enforcement officer for the North Alabama Drug Task Force. Defendant was acting under the color of state law and in the course and scope of his employment as a law enforcement officer with the City of Huntsville at all times material.

13.   DEFENDANT Steven Graham, hereinafter referred to as "Defendant Graham" or simply "Graham",  is a law enforcement officer for the North Alabama Drug Task Force. Defendant was acting under the color of state

law and in the course and scope of his employment as a law enforcement

officer with the City of Huntsville at all times material.

## **ALLEGATIONS OF FACT**

14.   In May 2022, Defendant Dickerson surveilled FORD's home after allegedly

receiving complaints of alleged drug sales from FORD's residence.

15.   On May 24, 2022, Dickerson was surveilling FORD's residence and

observed a black Ford F-250 truck enter FORD's driveway.

16.   Defendant Dickerson allegedly observed a white man exit the vehicle and

make contact with FORD for about three minutes before leaving.

17.   Defendant Dickerson proceeded to follow the black Ford F-250 truck out of

the neighborhood until he was able to conduct a traffic stop on the vehicle.

18.   During the traffic stop, Defendant  Dickerson made contact with Jeffrey

Farley, the driver of the truck, who he subsequently searched.

19.   Dickerson found crack cocaine in Jeffrey Farley's possession, who then

alleged this crack cocaine was purchased from FORD.

20.   Due to this allegation, Dickerson proceeded to draft an affidavit for a search

warrant of FORD's residence, which was approved by Magistrate Lee

Leggett.

21. <mark>The search warrant obtained by Dickerson did not explicitly authorize a "No-Knock" entry to FORD's residence, and Dickerson did not explicitly request, nor articulate a reason for, a "No-Knock" warrant in his affidavit.</mark>

22. The Defendant officers failed to identify grounds for a no-knock warrant or even request one before entering the home without authority. No emergency or exigency justified the entry into Mr. Ford's home. The officers disregarded Mr. Ford's constitutional rights.

23. On or around 7:35 PM, on May 24, DICKERSON, GRAHAM and seven other agents arrived outside FORD's residence.

24. One agent, who had been watching FORD's residence, stated to the arriving agents that the Chrysler which FORD left in earlier had returned, indicating that FORD was likely present in the residence.

25. The agents began to approach the residence from the east after "stacking up" in a line formation.

26. While nearing the front porch of the residence, one agent observed that the front door was ajar behind a closed glass screen door, which was relayed to the other agents.

27. The front door is visibly ajar on the body cam footage of the agents.

28.    The lead agent of the "stack" approached the glass screen door, grabbed the handle, and simultaneously shouted "police, search warrant" and opened the glass screen door.  Opening the screen door constituted an unlawful entry into the residence and violated a clearly established right to be secure in one's home, as established by the castle doctrine.

29.    Approximately one or two other agents shouted "police, search warrant" as Graham entered the residence.

30.    At no point prior to the lead officer's entry was any indication made by FORD, or could any indication have been reasonably drawn by the agents, that FORD had refused them admittance, posed a threat to their safety, was disposing of evidence, or in the process of some other reasonable exigency to dismiss compliance with the "knock and announce" requirement.

31.    Steven Graham entered FORD's residence, without giving proper notice to the Plaintiff and immediately fired four shots at Ford, with one officer yelling "get on the ground" as the shots were fired.  Graham essentially came into the house shooting simultaneously.

32.    FORD was struck in the right side and chest suffering physical injuries to his ribs, right lung, and back, nervous system and body as a hole.  He was treated for fractured ribs and hemothorax at the Crestwood Emergency Room and later at Huntsville Hospital.

33. FORD was not armed when he was shot, nor did he give any indication that he posed a threat or intended to threaten the agents.

34. FORD's immediately put his hands in the air as instructed and then was immediately shot by Defendant Graham.

35. FORD was simply sitting on his couch as the agents entered his home working on a project on his computer in his living room.

36. FORD was subsequently detained, given medical treatment, and had his property unlawfully searched and seized in accordance with the improperly served search warrant obtained by William Dickerson.

37. Upon search of FORD's residence, no crack cocaine was found.

38. This incident was a forced entry without notice or opportunity for Ford to comply. The actions were improper because they lacked Mr Ford's consent, exigent circumstances, or any lawful order from a court to authorize entry into the residence.

39. In this case, the City of Huntsville failed to discipline any of the officers named despite clearly egregious conduct that lead to a number of constitutional violations including illegal search and seizure and excessive force

40. Over the course of years, the City has repeatedly failed and refused to address widely known systemic deficiencies regarding the use of force by HPD police

officers. Furthermore, those officers have avoided responsibility through a flawed internal affairs and review board.

41. While the City had written policies and procedures prohibiting the use of excessive force, the City also had, and continues to maintain, an unwritten custom and practice established years prior to the subject May 24, 2022. unconstitutional seizure incident, of refusing to discipline and hold accountable officers who use unconstitutional, excessive and/or unskillful force in the line of duty of their duties as police officers, whether by shooting or otherwise.

42. Specifically, the City established a "Board" which ostensibly gave the appearance that the City was closely examining and reviewing each instance of force resulting in serious injury or death.

43. During the many years preceding this subjects shooting on May 24, 2022  the "board" invariably determined that the officer's force was proper and acceptable, even when the officer violated policy and/or used excessive, unconstitutional, and/or unskillful force. Upon information and belief, the supervisors of the board were rarely, if ever, critical of an HPD officer's use of force, and even when assertedly critical, no real discipline, education, or training was ever imposed.

44. Instead, the City controlled the "board," not only by having the City Attorney's Office sit in on the meetings but, more importantly, by restricting all decisions to three HPD supervisors picked by the HPD Chief of Police and as described

below. Although the Madison County's District Attorney's Office and the

Citizens Advisory Council are considered part of the "board" this appears to be

in name only as neither are involved in any discussion or determination as to

whether an officer violated policy or used excessive, unconstitutional, and/or

unskillful force, and neither is entitled to vote or have any say in whether

officers should face disciplinary action or receive more education and training.

45. In so doing, the City established a custom or practice of condoning excessive,

unconstitutional, and/or unskillful force -- a custom and practice that all HPD

officers knew would always protect them if they used excessive,

unconstitutional, and/or unskillful force.

46. Because of this custom and practice, the HPD officers subjectively believed,

and had good reason to know, that they would never suffer any negative

consequences for using excessive, unconstitutional, and/or unskillful force,

including excessive, unconstitutional, and/or unskillful deadly force. Thus, the

custom and practice resulted in encouraging HPD officers to use excessive,

unconstitutional and/or unskilled force.

47. The City was subjectively aware of the risk of harm of such a custom and

policy but, despite its knowledge, took no action to stop  the custom and

practice and thus knowingly allowed it to continue. The City and its governing

officials knew this custom and practice created a substantial risk of serious

harm, and the deprivation of constitutional rights, to residents, citizens, and

guests in Madison County. They also knew the continuance of the custom and

policy would result in the infliction of unnecessary pain and suffering by those

who interacted with the HPD. They were on notice of the custom and practice

from complaints, communications from correctional officers, from their own

observations, from common sense, from other injuries and death, from other

lawsuits and by other ways. Some (but not an all-inclusive list) of prior

instances are as follows.

48. We start with the incident involving Jeffery Parker that occurred on April 3,

2018. Parker called 911 and reported that he was suicidal.  Two senior officers

responded to this call and were by all accounts de-escalating the situation.

Officer Ben Darby, who was en route to the precinct, heard the call and rushed

to the scene. Darby, completely ignorant of what was going on inside and of the

efforts and progress of the initial responding officers, pushed past those officers

and inserted himself between them and Parker. Within 11 seconds of entering

the house Darby shot Parker in the mouth despite Parker not making any

threatening movements.

49. Immediately after the shooting, Huntsville Mayor Tommy Battle and the HPD

Chief McMurray began a media campaign/blitz supporting Darby, a blitz which

has continued through the internal review board clearing Darby, the subsequent

indictment and his recent conviction on May 7, 2021 and his appeal. Ultimately

Darby plead guilty after his conviction was vacated.

50. In fact, Darby's actions were not only ratified by the HPD and Mayor Battle but also the City Council which, in an unprecedented measure, authorized at least $125,000 in City money to defend Darby.   Councilwoman Jennie Robinson stated that paying for Darby's defense "sends a message" that the City "supports" the local police force."  Post-conviction, the Mayor and the HPD Chief have doubled down on supporting Darby and have gone as far as criticizing both the District Attorney for bringing forward the case and the jury for unanimously convicting him.

51. At least one Huntsville City Council member has retroactively indicated that the city made a mistake in authorizing the paid defense of Darby by the fact that no city representative viewed the video footage prior to voting on that expenditure.

52. Furthermore, it is widely known that the two original responding officers in the Darby case were sent to remedial training.[1]

53. It should  be noted that Darby was convicted by a Jury of murder. While that conviction was later set aside by the Alabama Court of Criminal Appeals, Darby ultimately plead guilty to manslaughter.  Therefore, the City of Huntsville ratified the behavior of an employee who by all accounts plead guilty to the crime of manslaughter.

---

[1] Compare this to the Stone case where an officer who committed what amounts to be an assault on an individual in custody necessitating medical treatment.

54. In addition to the Parker shooting, there have been numerous instances of excessive force committed against individuals by the HPD, demonstrating a pattern and practice.[2]  Upon information and belief, the three HPD supervisors found that the HPD officers acted appropriately in all of these instances.

55. Most recently the City of Huntsville settled a case for $600,000 where a mentally impaired 36 year old was hospitalized after the use of force by two Huntsville Officers on July 19, 2021. [3] This individual was a mentally impaired individual, described as having the mind of a 6 year old,  and someone who was known to "wander" and ultimately not committing any crime.

56. It was well known to HPD officers, that the City has a custom and practice of allowing its officers to use excessive, unconstitutional, and/or unskillful force. The HPD officers, had this knowledge from the incidents described above, from other similar incidents that occurred over the years, from their conversations with each other and with their superiors, through their daily observations regarding how HPD officers used force, and in other ways.

57.   The City of Huntsville also has a flawed process of issuing felony warrants through an untrained magistrate especially in the case of dangerous situations for drug task forces.

---

[2] See *Martinson V. Darby, et.al* - statement of facts 17-21; See also *Sampson V. City of Huntsville* 5:13 CV 2161 - strip search case from 2013, See Stone V. City of Huntsville  5:16-CV220 (similar in that this case also involved excessive force by a STAC officer).  Hobbs V City of Huntsville 5:23 CV 693 (officer was disciplined)

[3] Burton v. City of Huntsville, et al.  5:22:CV-629

58. No-knock warrants are inherently dangerous for both the law enforcement officers present, the intended subjects of such warrants and often times members of the public that are not the target of a search. There are many memorable cases over the last few years where individuals such as Breona Taylor are killed when a no-knock warrant raid takes place.  Simply put, the risk of no-knock warrants outweighs any benefit even when exigent circumstances are considered.

59. Several states have banned no-knock warrants. For example, The City of Louisville banned no-knock warrants months after Breonna Taylor was killed by police. One year after her death, the State of Kentucky legislated the scope of their use. Other cities such as Kileen ,Texas and Minneapolis, Minnesota have banned the practice of using no-knock warrants after tragedies in their communities.

## CLAIMS FOR RELIEF

## Count I – UNREASONABLE SEARCH AND SEIZURE under 42. U.S.C. 1983

## (Against DEFENDANT STEVEN GRAHAM and DEFENDANT WILLIAM DICKERSON )

60. Each of the paragraphs of the Complaint is incorporated as if fully restated herein.

61.    The  DEFENDANTS violated FORD's fourth amendment right to be free

from "unreasonable searches and seizures."

62.    The DEFENDANTS forced entry into FORD's home without giving

sufficient notice of their office, authority, and purpose, and without being

refused admittance by FORD, thus violating FORD's fourth amendment

rights which constituted a deprivation of FORD's "rights, privileges, and

immunities."

63.    FORD had no reasonable amount of time to respond to the DEFENDANTS

statements as they entered his home and no exigencies at the scene are

outlined by the DEFENDANTS or demonstrated in video evidence to justify

the officers' collective noncompliance with the "knock and announce"

requirement outlined in Ala. Code §15-5-9 and mandated under Wilson v.

Arkansas, 514 U.S. 927, 115 S. Ct. 1914 (1995).

64.    The excessive force deployed against FORD within his home pursuant to the

unlawful execution of a search warrant constitutes an unreasonable search

and seizure, and force used subsequent to an unlawful search and seizure is

*per se* unreasonable and a deprivation of FORD's "rights, privileges, or

immunities."

65.    Dickerson applied for a warrant based on limited and erroneous

information , bolstered by hearsay from a very shaky witness at best, which

in turn lead to the illegal search and seizure and excessive force. Also none of this information established exigent circumstances which in turn would trigger the need for a no-knock warrant.  The Defendant officers also had other less volatile or potentially dangerous means to bolster their criminal case. For example, the officers often initiate a controlled drug buy  with a confidential informant prior to applying for a search warranted.

66.     The Defendants actions were improper because they lacked the Plaintiff's consent, exigent circumstances or any lawful order from a court of law authorizing entry into the residence.

67.     The actions of the DEFENDANTS agents proximately caused damages to Plaintiff in loss of liberty, embarrassment, humiliation, physical injury, pain and suffering and mental and emotional distress.

68.     DEFENDANT officers, acting under the color of state law and with callous disregard of FORD's federally protected rights, caused the deprivation of FORD's federally protected rights. As a result of the nature of DEFENDANT officers' conduct, Plaintiff is entitled to recover punitive damages against the individual DEFENDANTS.

69.     This charge is levied against agents in their individual capacities.

## Count II – UNREASONABLE SEARCH AND SEIZURE
## (Against DEFENDANT CITY OF HUNTSVILLE) - MONELL LIABILITY

70.  Each of the paragraphs of the Complaint is incorporated as if fully restated herein

71. The Officers violated FORD's fourth amendment right to be free from "unreasonable searches and seizures."

72. The Officers  forced entry into FORD's home without giving sufficient notice of their office, authority, and purpose, and without being refused admittance by FORD violated FORD's fourth amendment rights and constituted a deprivation of FORD's "rights, privileges, and immunities."

73.  FORD had no reasonable amount of time to respond to the AGENTS' statements as they entered his home and no exigencies at the scene are outlined by the AGENTS or demonstrated in video evidence to justify the officers' collective noncompliance with the "knock and announce" requirement outlined in Ala. Code §15-5-9 and mandated under Wilson v. Arkansas, 514 U.S. 927, 115 S. Ct. 1914 (1995).

74. The fact that none of the eight AGENTS objected to the furtherance of FORD's unlawful detention and the dismissal of Ala. Code § 15-5-9 without an exigency to justify their collective noncompliance is *prima facia* evidence that this was simply not a case of an officer failing to use good judgment, but rather officers who were not properly trained as to the requirements of their duties.

75. The excessive force deployed against FORD within his home pursuant to the unlawful execution of a search warrant constitutes an unreasonable search and seizure, and force used subsequent to an unlawful search and seizure is *per se* unreasonable and a deprivation of FORD's "rights, privileges, or immunities."

76. The actions of the DEFENDANT agents proximately caused damages to Plaintiff in loss of liberty, embarrassment, humiliation, physical injury, pain and suffering and mental and emotional distress.

77. Defendant CITY OF HUNTSVILLE is responsible for the training of all Huntsville Police Department officers.

78.  This charge is levied against the Huntsville Police Department, who is liable for their failure to train their employees, and against each of the Defendants in their individual capacities.

79.     The City of Huntsville has failed to properly train the magistrates on issuing warrants especially warrants for drug searches which are often inherently

dangerous in nature.  This warrant was flawed and based on unreliable hearsay and  frankly should have never been applied for and certainly not issued.

80.    There are a number of examples of warrants being issued in Huntsville whereas the magistrate did not properly vet the information . Such an example is the case of a Lashonda Brown  in 2020 whereas a warrant was issued by the magistrate for domestic violence. That case was later dismissed at Municipal Court.  This case is analogous in that very  limited information was used  to obtain a warrant.  The magistrate has a duty not to rubber stamp every single warrant especially when officers and members of the public are put in very volatile situations.

81.    As also discussed in the facts section of the complaint, the City of Huntsville has bad policy when it comes to either issuing no-knock warrants or allowing them to be used when no exigent circumstances exist. Furthermore, even if  some exigent circumstances exist the City should refrain from no-knock searches and seizures due to the inherently dangerous nature of such procedures.  Officers should also be adequately  trained on the severe consequences of no-knock warrants.

**COUNT III EXCESSIVE FORCE - AGAINST ALL DEFENDANTS**

**82**. Each of the paragraphs of the Complaint is incorporated as if fully restated herein.

83.. HPD Officers Graham , while acting under color of law, deprived Ford of his Fourth Amendment right to be free from excessive or unreasonable force during an arrest or seizure.

84 This cause of action is brought against HPD Officer Graham and the City pursuant to 42 U.S.C. 1983, the Fourth Amendment as applied to the states via the due process clause of the Fourteenth Amendment, 42 U.S.C 1988.

85. Graham's unconstitutional and excessive acts of force against Ward were done with deliberate indifference and a callous disregard of Ward's Fourth Amendment rights.

86. The use of excessive and nearly lethal force was improper because the officers did not have any lawful reason to maintain a presence in Ford's house. The entry into Ford's home unnecessarily created a tactical scenario where the use of such force was a foreseeable and likely outcome.

87. Graham's use of excessive force was caused, in part by the unconstitutional and deliberately indifferent customs and practice of the City as set forth above. These 1983 claims against the City are not brought pursuant to the doctrine of respondeat superior, but pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)

and its progeny, because the City had a custom and practice that constituted a deliberate indifference to  Ward's constitutional rights that was the moving force behind unconstitutional and excessive use of force.

88. The City and its HPD supervisors and policymakers subjectively knew that their customs and practices in failing to discipline and/or educate officers who had used unconstitutional and excessive force would result in more instances of excessive force, serious injury, harm, and/or death. They were not only aware of the facts from which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded the risk to those like Ward who encounter HPD officers, and in so doing they acted with more than gross negligence.

89. The City's unconstitutional policies were the driving force behind HPD Officers Graham's use of unconstitutional and excessive force. As a direct and proximate result of the combining and concurring unconstitutional conduct of the responding officers and the City, Ward suffered from multiple gunshot wounds.

90.    The City of Huntsville and the policymakers for the city created an atmosphere where an unannounced and unjustified entry into Mr.Ford's private residence constitutes a supervisory failure that had the foreseeable outcome of an

excessive force encounter with Mr. Ford.  This entire search and the consequential

excessive force  was unnecessary and avoidable under the circumstances.


WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests this

Honorable Court (1) to enter judgment against HPD Officers Graham and

Dickerson and the City (2) to award him, in an amount determined by the jury, for

compensatory damages arising out of her death according to federal common law

remedy, including, but not limited to, lost wages and benefits, and future earning

capacity; (3) to award her attorney fees, expert witness fees, court costs, and

interest as allowed by law; and 4) specific injunctive relief as it applies to forced

reform of internal City of Huntsville Police Department Review boards, makeup of

that board and oversight of that board and 5) to award her all other relief as the

Court deems proper.


## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for the following relief:

a) Actual and punitive damages against…

b) Actual and Compensatory damages against?

c) Cost of the action.

d) Reasonable attorney's fees

e) Any other such relief as the court deems appropriate.


Respectfully submitted this the 22nd Day of May, 2024,


/s/ Martin Weinberg

WEI-035

Attorney for Plaintiff

PO Box  154 Shannon, AL. 35142

Phone 205-785-5575

attorneyweinberg@bellsouth.net

/

/s  Richard Rice

Attorney for Plaintiff

The Rice Firm LLC

115 Richard Arrington Jr. Blvd. N.

Birmingham, AL. 35203

205-618-8733

rrice@rice-lawfirm.com

PLEASE SERVE DEFENDANTS AS FOLLOWS:

City of Huntsville

City Clerk at 308 Fountain Circle (City Hall),

3rd Floor, Huntsville, Alabama 35801

Defendant Steven. Graham

City Clerk at 308 Fountain Circle (City Hall)

3rd Floor, Huntsville, Alabama 35801

Defendant  William Dickerson

City Clerk at 308 Fountain Circle

3rd Floor Huntsville, Alabama 35801